UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>  Plaintiff,<br>   v.<br>KEN POLVO GOMEZ,<br>  Defendant. | Case No. 20-cr-00076-WHO-1<br><br>**ORDER GRANTING MOTION TO DISMISS INDICTMENT**<br>Re: Dkt. No. 23 |

Ken Polvo Gomez moves to dismiss the pending indictment because the immigration court that ordered his removal to Mexico in 2018 never obtained jurisdiction to do so. For jurisdiction to vest, the regulations require that a noncitizen be provided with charging document, such as a Notice to Appear ("NTA"), that includes the address of the immigration court where the NTA will be filed. 8 C.F.R. § 1003.15(b). Gomez's initial NTA was defective because it did not include the address of the immigration court.

If the NTA does not contain the information, jurisdiction can still vest if a corrective notice specifying the information is provided. Gomez's deficient NTA was not cured by a subsequent notice that contained the omitted information and was purportedly served "c/o Custodial Officer" at his immigration detention facility. Gomez says that he never received it, some circumstantial evidence supports his testimony, and the procedure utilized by the government to establish service was not reasonably calculated to ensure that the notice would timely reach him in the normal course.

As a result, the immigration court lacked jurisdiction to remove Gomez, meaning that the government cannot establish a predicate element of the charged offense of illegal reentry following deportation in violation of 8 U.S.C. § 1326. Gomez has also met the requirements for a

1  successful collateral attack on his removal order pursuant to 8 U.S.C. § 1326(d). Because the
2  immigration court lacked jurisdiction to enter the removal order, Gomez's due process rights were
3  violated and he suffered prejudice because he was removed when he should not have been.
4  Having shown that the removal order was fundamentally unfair, Gomez need not show exhaustion
5  of administrative remedies or that he was denied judicial review. For these reasons, Gomez's
6  motion to dismiss the indictment is GRANTED.

## BACKGROUND

### I. FACTUAL BACKGROUND

#### A. Before Removal Proceedings

Gomez is a citizen of Mexico. In 2010, he was involved in a jewelry store heist in San Jose, California. Declaration of David Rizk in Support of Motion to Dismiss ("Rizk Decl.") [Dkt. No. 24] ¶ 9; Declaration of Jose Rosiles in Support of Opposition to Motion to Dismiss Indictment ("Rosiles Decl.") [Dkt. No. 29] Ex. 5 (court records from Santa Clara County Superior Court). A warrant was issued for his arrest, but he was not arrested for more than two years. On August 8, 2012, he was apprehended by Texas police, shortly after he reentered the United States across the Mexico border. Rosiles Decl., Ex. 3 (August 8, 2012 I-213 form). On August 9, 2012, he was served with a NTA, which set forth factual allegations against him regarding his unlawful presence in the United States. *Id.*, Ex. 4 (August 9, 2012 NTA).

Before the removal proceedings occurred, however, Gomez was extradited to California to face charges for the armed robbery he committed in San Jose in 2010. Rosiles Decl., Ex. 3 at 4. He was convicted in Santa Clara County Superior Court of felony second degree robbery and sentenced to six years imprisonment. *Id.*, Ex. 5.

#### B. Removal Proceedings

Gomez was brought into the Department of Homeland Security's ("DHS") custody on or around July 9, 2018, when he was transferred from the custody of the California Department of Corrections and Rehabilitation to the Imperial Regional Detention Facility in Calexico, California. Rosiles Decl. ¶ 5. On July 9, 2018, a deportation officer served Gomez with a NTA, which alleged that he entered the country illegally in violation of 8 U.S.C. § 1182(a)(6)(A)(i) and

because he had been convicted of committing a crime of moral turpitude in violation of 8 U.S.C. § 1182(a)(2)(A)(i)(I).  *Id.*, Ex. 6 (July 9, 2018 NTA).  The NTA contained blank spaces for the date and time of the hearing and for the "Complete Address of Immigration Court, including Room Number, if any."  Rosiles Decl., Ex. 6.  It stated that the date and time were "to be set" and the address space also indicated "time and date to be set".  *Id.*

Gomez specifically recalls receiving the NTA; his signature appears in the Certificate of Service box, confirming that he had received it.  *Id.*; Declaration of Ken Polvo Gomez ("Gomez Decl.") [Dkt. No. 25] ¶ 5.  He requested an "immediate hearing," waiving his right to a ten-day period for retention of counsel.  Rosiles Decl., Ex. 6.

On July 17, 2018, the immigration court generated a Notice of Hearing in Removal Proceedings ("NOH"), which stated that Gomez's removal hearing would take place on July 24, 2018 at 8:00 A.M. at the Imperial Regional Detention Facility at 1572 Gateway Road, Calexico, California 92231.  Rosiles, Decl., Ex. 7.  The Certificate of Service indicates that it was served to Gomez by mail "c/o Custodial Officer."  *Id.*  Gomez states that he never received the NOH or relevant information in advance regarding his master calendar hearing.  Gomez Decl. ¶ 7.  Instead, he asserts that early on the morning of July 24, 2018, he was told for the first time by security guards that his hearing would occur the same day at 8:00 A.M.  *Id.* ¶ 8.  He estimates that he learned of the hearing approximately thirty minutes before it began.  *Id.*

Gomez appeared at the removal hearing on July 24, 2018.  Rizk Decl., Ex. H at 0:00–0:20. After giving advisories to Gomez and other respondents appearing by video, the immigration judge ("IJ") found, based on Gomez's admissions, that he was removable.  *Id.*, Ex. I at 2:22–4:40. Gomez informed the IJ that he had a fourteen-year-old child who is a United States citizen.  *Id.*, Ex. J at 1:06.  The IJ asked Gomez if he had "talked to a lawyer or legal representative about whether you have any applications you can file," to which Gomez responded that he did not.  *Id.*, Ex. J at 3:02.  The IJ then asked, "do you know what you want to be doing sir, with your case?".  Gomez, who had already been in custody for two weeks, replied, "I want to be removed."  *Id.*, Ex. J at 3:15–3:25.  The IJ entered a removal order, noting that it was "upon respondent's request" and that he had waived his right to appeal.  *Id.*, Ex. K (July 24, 2018 Removal Order).  Gomez was

3

1 removed the next day on July 25, 2018. Rosiles Decl., Ex. 9.

2     Following his removal hearing, the immigration court attempted to serve Gomez with a copy of his removal order. Rosiles Decl. ¶ 9, Ex. 10; Declaration of Rosa Colunga in Support of United States' Opposition to Motion to Dismiss Indictment ("Colunga Decl.") ¶ 7, Ex. 2. The immigration court used the identical method of service as it used for Gomez's July 17, 2018 NOH: by mail "c/o Custodial Officer." Colunga Decl. ¶ 7, Ex. 2. This mail was marked "Received" on July 30, 2018. *Id.* However, because Gomez had been removed to Mexico five days earlier, the mail was undeliverable and returned to the immigration court on July 31, 2018. *Id.*; Rosiles Decl., Ex. 10.

### C. Today

The pending indictment alleges that Gomez was found in the United States sometime in 2019. He moved to dismiss the indictment on July 27, 2020, Defendant's Motion to Dismiss Pursuant to 8 U.S.C. § 1326(d) ("MTD") [Dkt. No. 23], because the defective NTA, which was not cured by the subsequent NOH, did not properly vest the immigration court with jurisdiction over the 2018 removal proceeding, rendering the proceedings fundamentally unfair.

## LEGAL STANDARD

### I. MOTION TO DISMISS AN INDICTMENT

Under Federal Rule of Criminal Procedure 12(b)(3)(B)(v), a defendant may move to dismiss an indictment on the ground that the indictment "fail[s] to state an offense." In considering a motion to dismiss an indictment, a court must accept the allegations in the indictment as true and "analyz[e] whether a cognizable offense has been charged." *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002). "In ruling on a pre-trial motion to dismiss an indictment for failure to state an offense, the district court is bound by the four corners of the indictment." *Id.* A motion to dismiss an indictment can be determined before trial "if it involves questions of law rather than fact." *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir.), *cert. denied,* 478 U.S. 1007 (1986).

### II. COLLATERAL ATTACK ON A DEPORTATION

"For a defendant to be convicted of illegal reentry under 8 U.S.C. § 1326, the government

4

must establish that the defendant left the United States under order of exclusion, deportation, or removal, and then illegally reentered." *United States v. Raya-Vaca*, 771 F.3d 1195, 1201 (9th Cir. 2014) (internal quotation marks and citation omitted). "A defendant charged under [section] 1326 has a due process right to collaterally attack his removal order because the removal order serves as a predicate element of his conviction." *Id.* (internal quotation marks and citation omitted).

To demonstrate that a prior deportation cannot serve as the basis for an indictment for illegal reentry, 8 U.S.C. § 1326(d) requires that a defendant "demonstrate that (1) he exhausted the administrative remedies available for seeking relief from the predicate removal order; (2) the deportation proceedings 'improperly deprived [him] of the opportunity for judicial review'; and (3) the removal order was 'fundamentally unfair.'" *Raya-Vaca*, 771 F.3d at 1201 (quoting 8 U.S.C. § 1326(d)) (brackets in original). "To satisfy the third prong—that the order was fundamentally unfair—the defendant bears the burden of establishing both that the deportation proceeding violated his due process rights and that the violation caused prejudice." *Id.* (internal quotation marks, citation, and brackets omitted).

## DISCUSSION

### I. IMMIGRATION COURT'S LACK OF JURISDICTION

#### A. Regulatory Framework and Relevant Ninth Circuit Case Law

In *Karingithi v. Whitaker*, the Ninth Circuit held that the regulatory definition of a NTA, not the statutory definition set forth in the Immigration and Nationality Act ("INA"), governs whether jurisdiction has vested in the immigration court. 913 F.3d 1158, 1160, (9th Cir. 2019), *cert. denied sub nom. Karingithi v. Barr*, 140 S. Ct. 1106 (2020). In so holding, it narrowed the reach of the Supreme Court's decision in *Pereira v. Sessions*, 138 S. Ct. 2105 (2018), which involved a deficient NTA in the context of the stop-time rule and looked to the statutory requirements of a NTA. *Id.* at 1161.[1]

---

[1] *Pereira* involved a deficient NTA in the context of the stop-time rule. Generally, nonpermanent residents who are subject to removal proceedings may be eligible for cancellation of removal if, among other things, they have "been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of [an] application." 8 U.S.C. § 1229(b)(1)(A). Under the stop-time rule, the period of continuous presence is "deemed to end . . . when the [noncitizen] is served a [NTA] under section 1229(a)." 8 U.S.C. § 1229(d)(1)(A).

Under the relevant regulations, "[j]urisdiction vests, and proceedings before an Immigration Judge commence, when a charging document is filed with the Immigration Court by the Service." 8 C.F.R. § 1003.14(a). A "[c]harging document means the written instrument which initiates a proceeding before an Immigration Judge," and includes a "Notice to Appear." 8 C.F.R. § 1003.13. Although the statute at 8 U.S.C. § 1229(a)(1)(G)(i) defines a NTA as including, among other things, the "time and place at which the proceedings will be held," the Ninth Circuit in *Karingithi* noted that the regulation at 8 C.F.R. § 1003.15(b) "does not require that the time and date of a proceedings appear in the initial notice." 913 F.3d at 1160. "Rather, the regulation compels inclusion of such information '*where practicable*.'" *Id.* (quoting 8 C.F.R. § 1003.18(b)) (emphasis added). When that information is not contained in the NTA, the regulation requires the IJ to "schedul[e] the initial removal hearing and provid[e] notice to the government and the [noncitizen] of the time, place, and date of hearing." *Id.* (quoting 8 C.F.R. § 1003.18(b)).

The initial NTA in *Karingithi* "satisfied the regulatory requirements" and vested the immigration court with jurisdiction. *Id.* at 1159. Even though the NTA did not satisfy the statutory requirement that the notice include the date and time of removal proceedings, "[a] notice to appear need not include time and date information to satisfy this [regulatory] standard." 913 F.3d at 1159–60. The Ninth Circuit also noted that petitioner "had actual notice of the hearings through multiple follow-up notices that provided the date and time of each hearing." *Id.* *Karingithi* did not decide the implications of a NTA that does not provide an address, as is the case here.

Unlike date and time, 8 C.F.R. § 1003.15(b) provides that "[t]he address of the Immigration Court where the Service will file" must be included in the NTA. Courts in this District have been split regarding what happens if the NTA does not include address information. *Compare United States v. Gutierrez-Ramirez*, No. 18-CR-00422-BLF-1, 2019 WL 3346481 (N.D. Cal. Jul. 25, 2019) (granting dismissal); *United States v. Rosas-Ramirez*, 424 F. Supp. 3d 758

---

Section 1229(a) requires that a NTA specify, among other things, "[t]he time and place at which the [removal] proceedings will be held." *Id.* § 1229(a)(1)(G)(i). The Supreme Court found that because Pereira's NTA merely ordered him to appear before an immigration judge in Boston "on a date to be set at a time to be set," it did not trigger the stop-time rule. *Pereira*, 138 S. Ct. at 2108.

6

(N.D. Cal. 2019) (granting dismissal); *with United States v. Mendoza*, No. 18-CR-00282-HSG-1, 2019 WL 1586774 (N.D. Cal. Apr. 12, 2019) (denying dismissal); *United States v. Arteaga-Centeno*, No. 18-CR-00332-CRB-1, 2019 WL 3207849 (N.D. Cal. Jul. 16, 2019) (denying dismissal).

The Ninth Circuit's recent opinion in *Aguilar Fermin v. Barr*, 958 F.3d 887 (9th Cir. 2020) addresses this question. In that case, petitioner moved to reopen her removal proceedings on the grounds that her NTA was deficient because it did not include the address of the immigration court. *Id.* at 889. Relying on the Board of Immigration Appeals' ("BIA") decision in *Matter of Rosales Vargas*, 27 I. & N. Dec. 745, 750 (BIA 2020), the court acknowledged that although "[section] 1003.15(b)(6) appears to be a clear statement that a notice to appear must include the address of the Immigration Court," when read in conjunction with section 1003.18(b), a failure to include the address "is not fatal" to the immigration court's jurisdiction. *Id.* at 895. "Given that the regulations expressly state that the omission of an address from an NTA may be fixed by a later hearing notice, it is reasonable to construe the regulatory provisions about when jurisdiction vests as allowing the IJ to assert jurisdiction in such circumstances." *Id.* Although the initial NTA in *Aguilar Fermin* was deficient under section 1003.15(b)(6) because it did not include the immigration court's address where the NTA would be heard, the subsequent NOHs the petitioner received, pursuant to section 1003.18(b), contained this information. Therefore, the IJ had jurisdiction to issue the removal order. *Id.*[2]

---

[2] I briefly address why the government's argument that the regulations are claim-processing rules, and not jurisdictional, is unconvincing. The Ninth Circuit in *Aguilar Fermin* found "*Rosales Vargas* and *Karingithi* are consistent" to the extent that both decisions held that "an omission of some of the information required by [section] 1003.14(a) and [section] 1003.15(b)(6) can be cured and is not fatal." *Aguilar Fermin*, 958 F.3d at 895. It did not adopt *Rosales Vargas*'s holding that the regulations are claim-processing rules. Instead, it reiterated its previous holding in *Karingithi* that the regulations define when the immigration court's jurisdiction vests. *Id.* at 893 ("We noted that immigration court jurisdiction is defined by DOJ regulations[.]") (citing *Karingithi*, 913 F.3d at 1160–61); *see also United States v. Ceja-Melchor*, No. 19-CR-00184-LHK, 2020 WL 1701976, at *7 (N.D. Cal. Apr. 8, 2020) (declining to follow *Rosales Vargas* because it contradicts with *Karingithi*, which is binding); *United States v. De Leon*, No. CR 19-00422 WHA, 2020 WL 2768959, at *3 (N.D. Cal. May 28, 2020) (rejecting government's argument that regulations are not jurisdictional because the Ninth Circuit "has explicitly held that the regulations define when the immigration court's jurisdiction vests, and has also accepted the idea that a failure to meet jurisdictional requirements could require the termination of proceedings").

**B.     Analysis**

Before discussing the deficiencies in the procedures utilized by the government in this case, it is worth remembering their context.  Gomez was detained in an immigration detention facility.  The government wanted to deport him to Mexico.  He did not have the right to appointed counsel to present his case.  Knowing when and where his hearing would take place—having a timeframe within which to seek assistance, prepare for the hearing, and alert family members – would be of obvious practical importance.  Federal regulations protect those interests by requiring that the government provide notice to the noncitizen with the date and location of the hearing.  Indeed, the immigration court's jurisdiction over the proceedings depends on it.

As described above, the Ninth Circuit's recent decision in *Aguilar Fermin* provides that lack of address information in the NTA does not necessarily deprive the immigration court of jurisdiction because it "may be fixed by a later hearing notice."  958 F.3d at 895.  It is clear that Gomez's initial NTA was jurisdictionally deficient because it failed to provide the address of the immigration court where the NTA will be filed, as required by 8 C.F.R. § 1003.15(b)(6).  *See* Rosiles Decl., Ex. 6.  The question is whether the subsequent hearing notice corrected that deficiency.

*Aguilar Fermin* and *Karingithi* did not resolve the implications of a corrective hearing notice that is not timely received by the noncitizen; it was undisputed that the noncitizens in those cases received curative notices.  *Karingithi*, 913 F.3d at 1162 (concluding that "the hearing notices Karingithi received specified the time and date of her removal proceedings"); *Aguilar Fermin*, 958 F.3d at 891, 895 (concluding Agular Fermin "received a supplemental notice providing the date, time, and location of her hearing," and it was "undisputed that [she] received proper notices of her removal hearings").  This case squarely presents that question.  Although the Ninth Circuit in *Karingithi* expressly noted that it "[did] not decide whether jurisdiction would have vested if she had not received this information in a timely fashion," 913 F.3d at 1162, its decision in *Aguilar Fermin* suggests that jurisdiction would not have vested if the noncitizen had not received the information in a timely fashion: "[W]e agree with the BIA that an initial NTA need not contain time, date, and place information to vest an immigration court with jurisdiction if such information

8

is provided *before* the hearing." 958 F.3d at 889 (emphasis added).

There is only one NOH that could have cured the jurisdictional defect of Gomez's NTA – the July 17, 2018 NOH. It contained the omitted information and was purportedly served on Gomez by mail "c/o Custodial Officer". Rosiles, Decl., Ex. 7. Gomez argues that this NOH did not cure the jurisdictional defect because he did not receive it prior to the removal hearing on July 24, 2018. MTD 18–19. The government responds that actual receipt of the NOH is not necessary because the NOH was served in a manner reasonably calculated to ensure that it reached Gomez. United States' Opposition to Motion to Dismiss Indictment ("Oppo.") [Dkt. No. 27] 10. Although it is unresolved whether the appropriate standard for this novel question is "actual receipt" of the corrective NOH or "reasonably calculated method of service", I find that the NOH at issue here fails both standards and that the jurisdictionally deficient NTA was not cured.

### 1. Actual Receipt

Gomez asserts that he never received the NOH, or any other advance notice in writing of the time and place of his hearing or the address of the immigration court. Gomez Decl. ¶ 7. There is no evidence to the contrary. He further contends that the government's evidence actually corroborates his assertion of non-receipt. Defendant's Reply in Support of Motion to Dismiss Indictment ("Reply") [Dkt. No. 31] 6. A later letter from the immigration court addressed to Gomez at the Imperial Regional Detention Facility, was mail-stamped on July 24, 2018. Colunga Decl., Ex. 2 at 3. This letter did not reach Gomez because he was removed to Mexico on July 25, 2018. Rosiles Decl., Ex. 9. The letter is stamped "Received" on July 30, 2018—showing that it took six days for the letter to arrive at the Imperial Regional Detention Facility. Colunga Decl., Ex. 2. On the next day, day seven, an employee of the facility processed the letter and responded that Gomez was not there. Colunga Decl., Ex. 2 at 2. The immigration court received that response on August 6—again, six days later. *Id.*, Ex. 2 at 2–3.

If one could extrapolate from the timing of deliveries of this later mail, one would suspect that it takes six days for correspondence between the immigration court and the detention facility just to be delivered, and at least one more day for mail to be processed at the detention facility. From this, Gomez argues that it is exceedingly unlikely that he could have received a NOH

generated on July 17, 2018 before his removal hearing at 8:00 A.M. on July 24, 2018.  Reply 7.

The government warns that believing Gomez's testimony that he never received the subsequent NOH "would wreak havoc on immigration proceedings, as thousands of noncitizens could void their removal order by simply denying they received notice."  Oppo. 12.  It contends that "[i]n the absence of clear evidence to the contrary, courts presume that public officers properly discharge their duties."  *Id.* (quoting *Del Norte Cty. v. United States*, 732 F.2d 1462, 1468 (9th Cir. 1984)); *Hernandez v. Gonzales*, 221 F. App'x 588, 590 (9th Cir. 2007) (unpublished) ("Absent evidence to the contrary, we presume that the immigration officers properly discharged their duties when issuing Hernandez's NTA.").  It argues that this presumption should extend to immigration court clerks and the staff at the Imperial detention facility in discharging their duties to serve Gomez with the NOH.

I am not simply taking Gomez at his word that he did not receive the NOH; the circumstantial evidence, however weak, supports his assertion.  And the government offers no evidence that rebuts it.  Instead, it provides a declaration from an immigration court employee who is "familiar with the process by which the Immigration Court maintains removal proceeding records."  Colunga Decl. ¶ 2.  She explains that the "immigration court serves [NOHs] and other correspondence via regular first class mail through the United States Postal Service," which includes "thousands of [NOHs] to detainees in the custody of DHS."  *Id.* ¶ 5.  This declaration explains how the immigration court clerks execute their duties in mailing notices from the front end, which I accept.

But there is no declaration that explains how long it takes for mail to be delivered from the immigration court to the Imperial Regional Detention Facility or how staff at the Imperial facility process the mail and deliver it to detainees.  There is no declaration from the custodial officer responsible for delivering the mail during the relevant time frame in July 2018.  I cannot conclude, therefore, that officers at the Imperial facility (who are not identified) properly executed duties (which are not described) and that therefore in the normal course Gomez would have timely received the NOH sent to him courtesy of an unnamed custodial officer.  I am left with Gomez's unrebutted declaration that he never received the July 17 NTA and the circumstantial evidence that

seems to support his testimony.

Even if I presume that staff at the Imperial facility fulfilled their duties to process inmate mail, that presumption is meaningless when I lack evidence of what the process is or how long it takes mail to get from the immigration court to the facility. I do not agree that Gomez needs to present "clear evidence to the contrary" in order to overcome such a presumption. *See Salta v. I.N.S.*, 314 F.3d 1076, 1078–79 (9th Cir. 2002) (in the context of deciding whether a noncitizen has demonstrated a lack of notice as basis for obtaining relief from a removal order entered *in absentia*, the presumption that Postal Service employees properly discharged their duties cannot be rebutted by a "bald and unsupported denial of receipt of certified mail"; however, where service is attempted by regular mail, not certified mail, the same strong presumption of delivery does not arise and less is required to rebut this weaker presumption); *Sembiring v. Gonzales*, 499 F.3d 981, 988 (9th Cir. 2007) ("In the typical regular mail case, the only proof of non-receipt beyond the respondent's statement that he or she did not receive notice . . . will be circumstantial evidence.") (internal quotation marks and citation omitted); *id.* at 983 (concluding petitioner, who asserted non-receipt at her home address and provided circumstantial evidence to support her assertion, "presented sufficient evidence in the Immigration Court to overcome the presumption of effective service," evidence that "was credible, corroborated, and wholly unrefuted by the government"). And in this case, the only circumstantial evidence I have supports Gomez's unrebutted testimony.

Gomez also points to two cases decided in this District that found similar NOHs served "c/o Custodial Officer" were "non-curative." *Rosas-Ramirez*, 424 F. Supp. 3d at 768 (quoting *Gutierrez-Ramirez*, 2019 WL 3346481, at *6). In *Gutierrez-Ramirez*, the Hon. Beth L. Freeman was unconvinced that a subsequent NOH could cure the defective NTA for "both factual and legal reasons." *Gutierrez-Ramirez*, 2019 WL 3346481, at *6. She found the argument legally unconvincing because nothing in the regulations indicates that the government can cure a non-compliant NTA by serving a subsequent NOH, "even if the [NOH] includes the information the [NTA] originally omitted." *Id.* at *7. The Hon. Lucy H. Koh adopted the same legal reasoning in *Rosas-Ramirez*. 424 F. Supp. 3d at 768.

While I agree with the government that *Aguilar Fermin* forecloses the legal conclusion that

11

subsequent NOHs cannot cure deficient NTAs, it does not foreclose the factual conclusions that Judges Freeman and Koh reached in the alternative. They found that "even if a [NOH] could cure the jurisdictional defects of a [NTA], there is no evidence in this case that the [NOH] was ever served on Defendant." *Gutierrez-Ramirez*, 2019 WL 3346481, at *6; *Rosas-Ramirez*, 424 F. Supp. 3d at 768. In drawing this conclusion, they found that the NOH "only indicates that the [NOH] was mailed to Defendant through a 'custody officer'" but there is "no evidence that the Custodia[l] Officer ever actually served the [NOH] on Defendant." *Rosas-Ramirez*, 424 F. Supp. 3d at 768 (quoting *Gutierrez-Ramirez*, 2019 WL 3346481, at *6). Gomez's NOH is similarly flawed; there is no evidence that the Custodial Officer ever actually provided him with the subsequent NOH.

At the hearing, Gomez pointed to another decision involving a NOH served "c/o Custodial Officer," in which the Hon. Jeffery S. White noted that "[e]ven if a two-step notice process properly vested the Immigration Court with jurisdiction, it is unclear to the Court that the notice of hearing was properly served upon Mr. Ramos-Urias" because "[h]is notice of hearing does not indicate that he was personally served as required under 8 C.F.R. § 103.8(c)(2)(i) (requiring that incarcerated person be served notice of hearing)." *United States v. Ramos-Urias*, No. 18-CR-00076-JSW-1, 2019 WL 1567526, at *3 n. 1 (N.D. Cal. Apr. 8, 2019). The NOH in that case only indicated that it was "served on Mr. Ramos-Urias's custodial officer but not on Mr. Ramos-Urias." *Id.* The government attempts to distinguish *Ramos-Urias* on the grounds that the plain language of 8 C.F.R. § 103.8(c)(2)(i), which reads "[i]f a person is confined in a penal or mental institution or hospital . . . service shall be made both upon him and upon the person in charge of the institution or hospital," does not apply to Gomez because he was confined in an immigration detention facility, a civil institution. That difference is not material for the purposes of effectuating service in an immigration detention facility, which shares many of the same characteristics of a penal institution (as opposed, say, to a private residence).

For the reasons above, on this record I find that Gomez did not actually receive the NOH.

### 2. Reasonably Calculated Service

The government argues that the proper inquiry here is not whether Gomez actually

12

received the NOH, but whether service of the NOH was "conducted in a manner 'reasonably calculated' to ensure that notice reaches the [noncitizen]." Oppo. 10 (quoting *Farhoud v. I.N.S.*, 122 F.3d 794, 796 (9th Cir. 1997)).

The petitioner in *Farhoud* had been removed *in absentia*, and later raised a "due process objection as to notice and opportunity to appear at the deportation hearing." 122 F.3d at 795. The notice was mailed by certified mail to his last known address and receipt was acknowledged by someone at that address. *Id.* at 796. The Ninth Circuit found that "[t]he method of service was reasonably calculated to ensure that notice reached the petitioner," and thus denied his due process claim. *Id.*

The government's reliance on *Farhoud* is unpersuasive. Unlike certified mail to the last known residential address of a noncitizen, the system the government used in this case to serve detained noncitizens subject to removal is not reasonably calculated to ensure service. Mailing notice to an unknown custodial officer at a detention facility about a hearing that is seven days away (when it may take roughly six days for a piece of mail just to arrive) without any record of how the mail was processed and delivered to the detainee, is not a procedure that is reasonably calculated to ensure that Gomez would receive notice of that hearing.

The government contends that the fact that the immigration court used the same address and the same method to serve Gomez with the second letter, dated July 24, 2018, and that the second letter was stamped as received by the Imperial facility, shows that every aspect of the service process functioned as intended, which would ensure that the NOH reached Gomez. While this might show that the method of service is designed to lead to receipt by the facility, it does not show that the method of service is reasonably calculated to ensure *timely* receipt by the detainee. Rather, as discussed above, this evidence shows the opposite; it makes it plausible that Gomez did not timely receive the NOH before the July 24, 2018 hearing. For the NOH to function as a curative notice to vest jurisdiction, the method of service must be reasonably calculated to ensure timely receipt before the removal hearing. The stakes are too high otherwise. Mailing notices to detained noncitizens "c/o Custodial Officer" may be a regular practice, as the government's declarations suggest, but that does not make it a reasonably calculated method of service under the

circumstances here.

The government argues that it was reasonable to serve Gomez by mail because the DOJ regulations do not require it to personally serve Gomez with notice and the Immigration Court Practice Manual recognizes that service by mail is effective as soon as the document is deposited with the Postal Service. Oppo. 11; *see* 8 C.F.R. § 1003.32(a) (all documents filed with or presented to the IJ "shall be simultaneously served by the presenting party on the opposing party or parties," and "[s]uch service shall be in person or by first class mail to the most recent address contained in the Record of Proceeding"); Immigration Court Practice Manual § 3.2(c) (explaining that, although immigration courts do not observe the "mailbox rule" for documents filed with the court, they do observe the "mailbox rule" for documents served on a party). That does not mean that mailing a notice by regular mail is, by definition, reasonably calculated to ensure service, particularly when it is mailed to an immigration detention facility and processed in a way that does not ensure timely receipt.

To be clear, I do not expect the government to provide proof that the exact NOH at issue here was properly served on Gomez or that the custodial officer responsible for mail delivery remembers delivering it. But simply saying that mailing notices to detained noncitizens is a routine practice, and allowed by the regulations in lieu of personal service, does not mean that mail sent to a detainee at the Imperial facility in July 2018 in care of an unnamed custodial officer a week before the removal proceeding was reasonably calculated to ensure receipt, particularly when there is no evidence of how unnamed custodial officers process mail to ensure timely receipt to immigration detainees like Gomez or how long it takes to receive mail from the immigration court.

The government is not required to use "heroic efforts" to ensure service, but it is required to do something more than what it did here. *See Dusenbery v. United States*, 534 U.S. 161, 170 (2002) (the Due Process Clause "does not require [] heroic efforts by the Government; it requires only that the Government's effort be "reasonably calculated" to apprise a party of the pendency of the action.") The Certificate of Service on the NOH only indicates that it was served to Gomez by mail courtesy of an unnamed custodial officer; that is simply not enough show that is reasonably

14

calculated to ensure service.[3]

I find that jurisdiction did not properly vest in the immigration court because the defective NTA was not cured by the subsequent NOH, which was not sent in a reasonably calculated way to ensure that Gomez received it before his July 24, 2018 hearing, and which Gomez asserts that he never received. His declaration is corroborated by circumstantial evidence and unrebutted by the government.[4]

## II.   SECTION 1326(D) REQUIREMENTS

I now analyze the above finding in the context of 8 U.S.C. § 1326(d), which sets forth three prongs that a defendant must establish to successfully collaterally attack a prior removal order. To challenge an underlying removal order in a criminal case alleging illegal reentry, a defendant must demonstrate that he "(1) exhausted any administrative remedies that may have been available to seek relief against the order; (2) the deportation proceedings at which the order was issued improperly deprived the [defendant] of the opportunity for judicial review; and (3) the entry of the order was fundamentally unfair." 8 U.S.C. § 1326(d). A removal order is fundamentally unfair if "(1) a defendant's due process rights were violated by defects in his underlying deportation proceeding, and (2) he suffered prejudice as a result of the defects." *United States v. Alvarado-Pineda*, 774 F.3d 1198, 1201 (9th Cir. 2014); *Raya-Vaca*, 771 F.3d at 1201.

Gomez's July 24, 2018 removal order was "fundamentally unfair" pursuant to section 1326(d)(3). Because the removal order was entered without jurisdiction, it was a violation of his due process rights. *Rosas-Ramirez*, 424 F. Supp. 3d at 770; *Gutierrez-Ramirez*, 2019 WL 3346481, at *8; *Ramos-Urias*, 348 F. Supp. 3d at 1037. Gomez's appearance at the hearing does

---

[3] Although the prison context is different than immigration detention, issues of service involving custodial officers there are instructive. *See Nunley v. Dep't of Justice*, 425 F.3d 1132, 1137 (8th Cir. 2005) ("The best reason to abandon in the prison context the presumption that mailed notice is adequate is that prison mail must navigate a second mail-distribution system. A postal worker does not personally deliver mail to each prisoner in his or her cell. Instead, the mail is left at some administrative office (or picked up at the post office by a prison employee) and then distributed within the prison.").

[4] Given my conclusion, I need not address Gomez's alternative argument for dismissal based on the immigration court's lack of statutory authority.

15

not change this result because the "hearing [was] void for lack of jurisdiction and his opportunity to be heard was not a fair one." *Gutierrez-Ramirez*, 2019 WL 3346481, at *8 (citation omitted).

Relatedly, because the removal order unlawfully resulted in Gomez's removal, it prejudiced him. Put differently, Gomez was prejudiced because he was "removed when he should not have been." *Gutierrez-Ramirez*, 2019 WL 3346481, at *8 (quoting *United States v. Aguilera-Rios*, 769 F.3d 626, 630 (9th Cir. 2014)); *see United States v. Camacho-Lopez*, 450 F.3d 928, 930 (9th Cir. 2006) ("Camacho was removed when he should not have been and clearly suffered prejudice."); *United States v. Ceja-Melchor*, 445 F. Supp. 3d 157, 169 (N.D. Cal. 2020) (finding these Ninth Circuit cases "readily applicable to the context of a jurisdictionally defective NTA" because, as the Ninth Circuit has explained, "even if the Immigration Court would have otherwise been able to remove Defendant 'through a formal removal proceeding' that was jurisdictionally sound, Defendant's 'removal on illegitimate grounds is enough to show prejudice'") (quoting *United States v. Ochoa-Oregel*, 904 F.3d 682, 686 (9th Cir. 2018)).

Having shown a due process violation and prejudice, and therefore meeting his burden to show "fundamental unfairness", Gomez "need not show exhaustion of administrative remedies or that he was denied judicial review pursuant to [sections] 1326(d)(1) and (2)." *Ramos-Urias*, 348 F. Supp. 3d at 1037 (citing cases); *Gutierrez-Ramirez*, 2019 WL 3346481, at *8 (same); *Rosas-Ramirez*, 424 F. Supp. 3d at 771 (same); *see also Lazaro v. Mukasey*, 527 F.3d 977, 980 (9th Cir. 2008) ("A petitioner is entitled to relief from a defective NTA if he show[s] that the Immigration Court lacked jurisdiction.") (internal quotation marks and citation omitted); *United Farm Workers of Am., AFL-CIO v. Ariz. Agric. Emp't Relations Bd.*, 669 F.2d 1249, 1253 (9th Cir. 1982) ("Exhaustion of administrative remedies is not required where . . . the administrative proceedings themselves are void."); *United States v. Ortiz*, 347 F. Supp. 3d 402, 405–07 (D.N.D. 2018) (defendant need not satisfy judicial review requirement where immigration court lacked jurisdiction because the requirement "surely . . . requires an Immigration Judge's decision be anchored in an exercise of proper jurisdiction").

Moreover, though Gomez evidently waived his right to appeal, as indicated on the July 24, 2018 removal order, "this waiver cannot be considered knowing and voluntary due to the

16

immigration court's lack of jurisdiction." *Ramos-Urias*, 348 F. Supp. 3d at 1037 (citing *United States v. Niebla-Ayala*, 342 F. Supp. 3d 733, 746 (W.D. Tex. 2018) ("[A]n invalid waiver improperly deprives the noncitizen of the ability to both exhaust his administrative remedies . . . and seek judicial review.")).

Accordingly, Gomez has mounted a successful section 1326(d) collateral attack.[5] His July 24, 2018 removal order is void because the IJ lacked jurisdiction to enter it. Because the government cannot establish a predicate element—the prior removal or deportation of Gomez—of the sole offense in the indictment, his motion to dismiss the indictment is GRANTED.

## CONCLUSION

For the foregoing reasons, Gomez's motion to dismiss the indictment is GRANTED.

**IT IS SO ORDERED.**

Dated: November 4, 2020



William H. Orrick
United States District Judge

---

[5] Gomez points out that some district courts have held that 8 U.S.C. § 1326(d)'s three-part test does not apply to defendants who challenge the validity of a deportation order when the immigration court lacked jurisdiction over the removal proceeding. MTD 19; *see, e.g.*, *United States v. Arteaga-Centeno*, 353 F. Supp. 3d 897 (N.D. Cal. 2019), *vacated on other grounds,* 2019 WL 1995766 (a defendant's challenge to a jurisdictionally deficient removal order "is not a 'collateral challenge' to his deportation order, because there is no removal order to be collaterally attacked"). I need not resolve that split here because I find that Gomez has met the requirements of 8 U.S.C. § 1326(d). *See Ramos-Urias*, 348 F. Supp. 3d at 1037 ("This Court need not decide whether the § 1326(d) analysis is or is not necessary in the context of a void notice to appear, because the Court concludes that Mr. Ramos-Urias makes the requisite showing.").